1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KIMBERLY DORSEY,                          No.  2:15-cv-02126-KJM-CKD

12                  Plaintiff,

13            v.                                ORDER

14   METROPOLITAN LIFE INSURANCE
     COMPANY,
15
                    Defendant.
16

17

18            After being denied long-term disability (LTD) benefits, plaintiff Kimberly Dorsey

19   sued Metropolitan Life Insurance Company (MetLife) for allegedly violating the Employee

20   Retirement Income Security Act (ERISA).  Defendant MetLife cross-moved, contending denial

21   was proper.  At hearing, David Allen appeared for Ms. Dorsey and Robert Hess appeared for

22   MetLife.  ECF No. 27.  As explained below, the court DENIES Ms. Dorsey's motion and

23   GRANTS MetLife's cross-motion.

24   I.      PROCEDURAL HISTORY

25            Plaintiff filed her complaint on October 13, 2015.  ECF No. 1.  After MetLife

26   answered, ECF No. 8, the parties agreed the case would be resolved through cross-motions for

27   judgment under Federal Rule of Civil Procedure 52, ECF No. 16.  The parties then cross-moved,

28
                                                1

1  Pl.'s Mot., ECF Nos. 18; Def.'s Mot., ECF No. 20, and opposed each other's cross-motions, Pl.'s

2  Opp'n, ECF No. 21; Def.'s Opp'n, ECF No. 22.

3  II.      FACTUAL BACKGROUND

4           The administrative record contains relevant facts.  *See Abatie v. Alta Health & Life*

5  *Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (district courts rely on the administrative record in

6  assessing an ERISA claim).  In the ERISA context, "the usual tests of summary judgment, such as

7  whether a genuine dispute of material fact exists, do not apply."  *Harlick v. Blue Shield of Cal.*,

8  686 F.3d 699, 706 (9th Cir. 2012).

9           A.      Plaintiff's Employment and MetLife Insurance Plan

10          Plaintiff was a business systems analyst at Sutter Medical Health (Sutter).  AR

11  1059.  Her job was to examine and resolve Sutter's Business system issues, test and implement

12  changes, and provide reports.  AR 1070.  Plaintiff's position required six to eight hours daily of

13  using her hands and viewing computer screens, three to six hours of sitting, bending and twisting

14  the neck, and occasional walking, standing, bending, and twisting.  AR 1070–73.  Plaintiff's job

15  was designated as sedentary and she did not have to lift or carry more than ten pounds.  AR 1072,

16  1152.

17          Sutter provided LTD benefits through MetLife, Sutter's insurer and claims

18  administrator.  AR 1357–1418.  To be disabled under MetLife's insurance Plan (the Plan), one

19  must show during the "elimination period," defined as beginning on the day the applicant first

20  claims disability plus 180 days thereafter, and for the next 24 months:

21              You are unable to perform with reasonable continuity the
               Substantial and Material Acts necessary to pursue Your Usual
22              Occupation and You are not working in Your Usual Occupation.

23  AR 1379, 1382.  Substantial and Material Acts means the important tasks, functions, and

24  operations of one's "usual occupation" that cannot be reasonably omitted or modified.  AR 1383.

25          B.      Plaintiff Applies for LTD Benefits

26          On December 4, 2012, when she was 36 years old, plaintiff performed her last day

27  of work.  AR 1126–27.  Three months later, on March 5, 2013, plaintiff applied for LTD benefits,

28

contending she could no longer work because of injuries from a March 2010 car accident. *Id.*; AR 1132.

On March 11, 2013, MetLife claims specialist (CS) Jacklin Roberts interviewed plaintiff to determine her LTD benefit eligibility. AR 1133–34. CS Roberts asked about impairments precluding plaintiff from working, and plaintiff identified a neck injury from the 2010 car accident. AR 1134. When asked about her daily living activities, plaintiff said she drove her car, went grocery shopping, used her microwave, brushed her teeth, occasionally washed dishes and washed one small load of laundry per week. AR 1134–35. In the end, plaintiff stated she did not intend to return to work. AR 1136.

C.    Evidence Provided in Support of LTD Claim

During the LTD application process, MetLife obtained medical records from plaintiff's health care providers: (1) Dr. Kurt Armstrong, a chiropractor; (2) Dr. Phillip Orisek, an orthopedic surgeon, (3) Dr. Vinay Reddy, a doctor at the Spine and Nerve Diagnostic Center in Sacramento, California; and (4) Ethelynda Jaojoco, a physical medicine and rehabilitation doctor at the Spine and Nerve center. AR 1142, 1162.

MetLife Nurse Consultant (NC) Gayle Elliot reviewed the records, which included notes from several office visits with Drs. Armstrong, Orisek, Reddy and Jaojoco. AR 1145–55. An April 2010 magnetic resonance imaging scan (MRI)[1] revealed three disc bulges in plaintiff's cervix.[2] 1146. These bulges "correlate[d] clinically for radiculopathy,[3] . . . specifically . . . nerve root distribution." *Id.* The notes also revealed a mild loss of lumbar lordosis[4] in the neutral

---

[1] A magnetic resonance imaging scan, or "MRI," is used to diagnose medical conditions. STEDMAN'S MEDICAL DICTIONARY 876 (27th ed. 2000).

[2] In this context, the cervix is the neck. STEDMAN'S MEDICAL DICTIONARY 324 (27th ed. 2000).

[3] Radiculopathy is a disorder of the spinal nerve roots. STEDMAN'S MEDICAL DICTIONARY 1503 (27th ed. 2000).

[4] Lordosis is the normal curvature of a human's lumbar and cervix. STEDMAN'S MEDICAL DICTIONARY 1032 (27th ed. 2000). Lumbar lordosis occurs when one's spine curves more than normal. STEDMAN'S MEDICAL DICTIONARY 513370 (2014 ed.).

3

positions and multilevel disc bulges in the lower spine.  *Id*.  Notes from July 2010 revealed neck and lower back pain with radiation into upper and lower extremities.  AR 1147.  August 2010 notes revealed a small disc herniation at C–4 to C–5 with a small protrusion from C–6 to C-7, and a small annular tear in the lower spine.  *Id*.

A July 2012 electromyogram (EMG)[5] revealed radiculitis at C–7.  AR 1208.  In December 2012 to January 2013, plaintiff complained of headaches, neck and back pain, and difficulty working due to pain.  AR 1150–51.  For her back and neck pain, she received regular trigger pain injections and chiropractic care.  AR 1152, 1243.  She was also diagnosed with the following conditions: neck numbness, migraines, cervical degenerative disc disease[6] and radiculitis, lumbar degenerative disc disease, bipolar disorder and depression.  AR 1151–1152.

From February to May 2013, plaintiff continued to complain of headaches, neck and back pain and myofascial pain.[7]  AR 1149, 1164.  Plaintiff regularly received spine adjustments and trigger injections as treatment.  AR 1148–1149, 1180, 1214.  By May 2013, office visit notes revealed a mild cervical degenerative disc disease but no spinal cord compression, spinal cord signal abnormality, or spinal cord deformity.  AR 1215.  After reviewing the medical records, NC Elliot concluded plaintiff had the following medical conditions: (1) chronic neck pain, (2) cervical degenerative disc disease, (3) myofascial pain, (4) migraines, and (5) bipolar disorder and depression.  AR 1160.

---

[5] An electromyogram, or "EMG," is a graphic representation of electric currents associated with muscular action.  STEDMAN'S MEDICAL DICTIONARY 576 (27th ed. 2000).

[6] As explained by a colleague, degenerative disc disease is "an arthritic process in the spine by which the vertebral discs wear down and lose fluid.  This condition reduces the ability of the discs to act as shock absorbers and makes them less flexible.  The loss of fluid also makes the discs thinner and narrows the distance between the vertebrae.  In addition, tiny tears or cracks in the outer layer (annulus or capsule) of the disc may result, and the jellylike material inside the disc (nucleus) may be forced out through these tears or cracks, which causes the disc to bulge, break open (rupture), or break into fragments."  *Watson v. Sisto*, No. 07–01871, 2011 WL 5155175, at *5 (E.D. Cal. Oct. 28, 2011).

[7] Myofascial pain syndrome is characterized by aching pain, stiffness and tenderness of muscles.  STEDMAN'S MEDICAL DICTIONARY 1761 (27th ed. 2000).

In addition to reviewing the medical records, NC Elliot also reviewed a restrictions and limitations report from Dr. Armstrong, plaintiff's chiropractor. AR 1160–61. This report stated plaintiff could sit for zero to one hour intermittently, stand for one hour intermittently, walk for two hours intermittently, and could not climb, twist, bend, stoop, or reach above the shoulder. AR 1161. The report also stated, however, that plaintiff could drive, make quick meals, dust her house, do dishes and laundry, and do fine finger and eye/hand movements. *Id.*; AR 1156–57. Dr. Armstrong concluded plaintiff was not capable of working. AR 1156–57.

After reviewing, NC Elliot opined the records did not make clear why plaintiff could sit only zero to one hour intermittently, stand one hour intermittently, and walk two hours intermittently. AR 1160–61. NC Elliot concluded plaintiff may be capable of working her sedentary level position. *Id.* But NC Elliot then followed up to clarify the medical record and to determine plaintiff's functionality. *Id.* Specifically, NC Elliot requested updated medical records clarifying whether plaintiff's bipolar disorder and depression prevented her from working. AR 1164. On May 16, 2013, plaintiff called MetLife and stated she claimed disability only for her neck and back pains; she did not claim disability for her mental conditions. AR 1168. She stated she had "always been able to work with her bipolar condition," and had been seeing a psychiatrist, Dr. Ni Ni Hla, "for years." *Id.*

D. NC Elliot's Discussion with Dr. Armstrong about Work Hardening Program

On May 24, 2013, NC Elliot spoke with Dr. Armstrong about his restrictions and limitations report. AR 1174–76. NC Elliot noted the report did not preclude a finding of functionality, for plaintiff could drive, grocery shop, cook with a microwave, do laundry, wash dishes, and take care of two children ages five and eleven. AR 1175. Further, because plaintiff was younger than 40, NC Elliot explained MetLife offered return to work services, or a "work hardening program," in which MetLife would work with plaintiff's health care providers to create a successful return to work based on plaintiff's functional capabilities. *Id.* Dr. Armstrong was "very agreeable" to the program. *Id.* A month later, when MetLife explained the program to plaintiff on June 24, 2013, she declined to participate. AR 1197.

After plaintiff declined, NC Elliot continued the review process to determine LTD benefit eligibility. She called Dr. Armstrong to request updated medical records, including updated restrictions and limitations reports. AR 1182, 1199. Dr. Armstrong submitted an updated restrictions and limitations report materially similar to the first. AR 1204. As with the first report, Dr. Armstrong noted plaintiff could not return to work indefinitely. AR 1216. NC Elliot reviewed this updated report, AR 1205, and concluded it was overly restrictive, especially considering Dr. Armstrong had agreed to plaintiff's participating in the work hardening program. AR 1216. NC Elliot then requested higher-level review from a MetLife medical director to clarify whether plaintiff's conditions impaired her functioning and work capacity. AR 1209, 1211.

E.     <u>Referral to MetLife Medical Director for Higher Level Review</u>

NC Elliot referred plaintiff's claims to David S. Peters, M.D., a MetLife Medical Director, for higher-level review. AR 1212. Based on the record, Dr. Peters concluded plaintiff had "significant lumbar and cervical MRI changes in addition to chronic right cervical radiculitis on EMG." AR 1219. Despite these conditions, Dr. Peters noted plaintiff could still do "shopping, driving, and childcare." *Id.* In the end, Dr. Peters opined plaintiff should be capable of "modified, full time (8 hour per day) work." AR 1219–1220. This modified work would consist of limiting any lifting, carrying, pushing, or pulling to ten pounds and allowing two to three minute stand and stretch breaks at least every hour for comfort in addition to standard morning, afternoon, and lunch breaks. AR 1220.

On August 8, 2013, NC Elliot reviewed Dr. Peters' findings and concluded Dr. Peters' review was incomplete because Dr. Peters had not responded to all questions presented to him. AR 1221. Accordingly, NC Elliot asked Dr. Peters to complete a further review to respond "to questions posed." AR 1221–22. On August 13, 2013, Dr. Peters' submitted an amended opinion. AR 1229. In the amended opinion, Dr. Peters opined plaintiff's physical functional limitations were due to lumbar and cervical degenerative disc disease, both of which were present at the start of the elimination period and appeared to be ongoing. AR 1228. While other

conditions were present, such as migraines, occipital neuralgia,[8] and brachial neuropathy,[9] Dr. Peters opined the record did not support claims that the frequency and severity of these conditions would significantly limit plaintiff's ability to perform a sedentary position with modifications. AR 1228.  With plaintiff's limitations, Dr. Peters opined, "standing [and] walking should be limited to twenty minutes per hour and to a daily total of 2.5 hours; and fine fingering, hand [and] eye movements and repetitive upper extremity movements at waist [and] desk level should not require restrictions."  AR 1228–29.  Dr. Peters also opined plaintiff's position should be limited to lifting, carrying, pushing, or pulling to ten pounds and allowing two to three minute stand and stretch breaks at least every hour for comfort in addition to standard morning, afternoon, and lunch breaks.  AR 869.  As with his earlier recommendation, Dr. Peters opined plaintiff should be able to return to Sutter and work eight hours with modification or participation in the vocational rehabilitation or "work hardening" program.  AR 1235, 1246.

MetLife sent copies of Dr. Peters' reports to plaintiff and plaintiff's medical providers, Dr. Reddy, Dr. Armstrong and Dr. Jaojoco, and asked them to respond if they had any comments or disagreements.  AR 1229.  MetLife received no responses.  AR 1270.

F.    MetLife Denies LTD Benefits Claim

After receiving no responses, LTD claims specialist (CS) Jacklin Roberts assessed plaintiff's file and concluded plaintiff was physically limited.  AR 1249.  Specifically, CS Roberts concluded the medical records showed plaintiff had "lumbar and cervical MRI changes and chronic right cervical radiculitis, which preclude[d] her ability for prolonged standing and walking."  *Id.*  CS Roberts further concluded plaintiff had "chronic neck and back pain," and "any significant improvement in [plaintiff's] functionality" was unlikely.  *Id.*  CS Roberts ultimately agreed with Dr. Peters' assessment, however, that plaintiff could work with modified conditions

---

[8] Occipital neuralgia, also known as "posttraumatic neck syndrome," consists of neck pain, tenderness, and spasms resulting from neck trauma, most often of the whiplash variety.  *See* STEDMAN'S MEDICAL DICTIONARY 599370 (occipital neuralgia), 887270 (posttraumatic neck syndrome) (Online ed. 2014).

[9] Brachial plexus neuropathy is a neurological disorder, characterized by the sudden onset of severe pain in the shoulder area.  STEDMAN'S MEDICAL DICTIONARY 1212 (27th ed. 2000).

but a full-time work schedule. AR 1248–49. CS Roberts referred plaintiff's claim to vocational

rehabilitation consultant (VRC) Janet Walsh on September 11, 2013, to determine if plaintiff

could perform her "usual" occupation but with modifications. AR 1249. On September 30, 2013,

VRC Walsh opined plaintiff should in fact be able to perform her "usual" occupation with

modifications. AR 1271. That same day, CS Roberts recommended MetLife deny plaintiff's

LTD claim, referencing Dr. Peters' opinion that plaintiff could do modified work as support. AR

1273. MetLife again sent Dr. Peters' report to plaintiff's treating physicians, but again no one

responded. AR 1273. VRC Walsh then completed her review and also opined plaintiff should be

able to perform plaintiff's "usual" occupation of sedentary work, albeit with modifications as Dr.

Peters opined. *Id*.

     On October 1, 2013, MetLife sent plaintiff a letter denying her LTD claim on

grounds the medical records did not support disability from December 5, 2012, plaintiff's last day

of work, through the elimination period, ending on June 3, 2013. AR 823–827, 1274, 1376. The

letter, relying on Dr. Peters' opinion and report, stated MetLife's position that plaintiff would be

able to perform work with the following restrictions and limitations: (1) lifting, carrying, pushing,

and pulling occasionally up to ten pounds; (2) changing seat positions as needed for comfort with

two to three minute breaks per hour; (3) limiting twisting, bending, and stooping; and (4) standing

and walking for only twenty minutes per hour for a 2.5 hour daily total. AR 825; *see also* AR

869, 1228-1229.

    G.    <u>Plaintiff Appeals MetLife's Denial</u>

     On March 28, 2014, plaintiff appealed MetLife's LTD denial internally to MetLife

disability appeals specialist Evelyn Murphy. AR 470–72. Despite plaintiff's express statement

that her disability claim was not based on her mental impairment, AR 1168, plaintiff's attorney on

appeal contended her disability is based in part on "anxiety and depression" in addition to

"insomnia." AR 478.

     MetLife submitted the appeals record to two independent physician consultants

(IPC) for review: (1) Board Certified Psychiatrist Marcus Goldman, M.D., and (2) Neil McPhee,

M.D., who is Board Certified in Physical Medicine and Rehabilitation and Pain Management. AR 433, 469, 1321.

### 1. Dr. Goldman Reviews Plaintiff's Mental Conditions

The psychiatric IPC, Dr. Goldman, watched a video submitted in support of the appeal. The video included an interview of plaintiff,[10] in which plaintiff discussed the impact her migraine headaches, pain and other medical issues had on her functionality. AR 1325. Dr. Goldman stated the plaintiff's presentation was "grossly unremarkable" because throughout the interview, plaintiff answered questions appropriately, "was appropriate in demeanor and dress, was cooperative with appropriate and full range of affect, articulate [and] linear with normal speech." *Id.*

In addition to watching the video, Dr. Goldman reviewed the rest of plaintiff's LTD application records to determine whether plaintiff had functional limitations from a psychiatric perspective as of December 5, 2012 and beyond. AR 429. In particular, Dr. Goldman evaluated the record to determine (1) whether it supported a diagnosis of migraines, anxiety, depression, and insomnia, and (2) whether such conditions restricted plaintiff's capacity to perform her sedentary job. AR 429.

Dr. Goldman noted that in 2012, progress notes from Dr. Reddy at the Spine and Nerve Diagnostic Center revealed overall stability despite intermittent insomnia, headaches, and depression. AR 429–430. By December 6, 2012, the plaintiff was doing well with no depression or mood swings. *Id.* From January 3, 2012 to August 13, 2013, the plaintiff's mental status was "unremarkable" with no evidence of depression or mood swings. AR 430.

By September 2013, after the end of the elimination period and before Met Life's initial denial of her claim on October 1, 2013, plaintiff felt upset with her providers, stressed out about her pain issues, and she exhibited passive suicidal thoughts. *Id.* A week after MetLife denied plaintiff's LTD claim, plaintiff became "labile and depressed" and exhibited suicidal thinking. *Id.* By November 2013, a month after the claim denial, plaintiff reported stress and

---

[10] It appears to the court the video was taken on March 24, 2014. *See* AR 1325.

lack of motivation with increased depression and anxiety. *Id.* During the MetLife appeals process, plaintiff's medical reports revealed she was depressed and anxious, had "poor" cognition, exhibited suicidal thinking, and had complaints of trouble sleeping. *Id.* Based on these observations, IPC Goldman continued to state plaintiff's condition was "unremarkable." *Id.*

By February 2014, plaintiff reported feeling stressed and overwhelmed. *Id.* As IPC Goldman noted, approximately a month later, on March 12, 2014, plaintiff was diagnosed with bipolar disorder and Attention Deficit Hyperactive Disorder (ADHD), after some mental status decline in late 2013 and early 2014; her response to treatment at that point had been minimal. AR 431. A document in plaintiff's file rated her ability to make occupational, performance, and social adjustments as "fair to poor," with "wors[ening] concentration" *Id.* Office visit notes also recorded plaintiff's complaints of "constant pain" due to family stressors and difficult financial situations. AR 430.

Based on these observations, IPC Goldman said "functional limitations" during the elimination period expiring on June 3, 2013, were not supported. AR 431. Specifically he noted the absence of "dedicated psychotherapy notes," suggesting "an intensity of treatment inconsistent with the degree of psychopathology purported." AR 432. Based on the record he reviewed, he noted "the mental status examinations . . . are generally unremarkable but for later in 2013 and early 2014." AR 431. He said it was unclear whether plaintiff's increased anxiety was related to "financial stress associated with denial of benefits or ongoing pain complaints." *Id.* Finally, he cited plaintiff's daily activities to conclude "there is no data to support significant or severe impairments in this claimant's capacity to manage her activities . . . of daily living." AR 432.

2.    Dr. McPhee Reviews Plaintiff's Physical Conditions

Dr. McPhee, a Board Certified professional in Physical Medicine and Rehabilitation and Pain Management, served as the second IPC and reviewed the appeal record for the following of plaintiff's physical conditions: (1) migraine headaches; (2) jaw pain; (3) neck pain due to cervical disc herniations; (4) radicular symptoms from her neck; (5) mid back and chest pain; (6) low back and hip pain; (7) lumbar disk herniation and annular tear; and (8)

radicular symptoms from her lower back, "butt," sides of her legs, calf, knees, ankles and feet. AR 434.

Dr. McPhee opined plaintiff's purported pain and disability was "markedly out of proportion to the degree of degenerative findings on imaging and examination findings or tenderness and trigger points with intact neurological function." AR 466. In particular, Dr. McPhee noted while plaintiff complained of pain before stopping work, plaintiff had a documented history of "chronic neck, mid back, and low back pain with radicular symptoms that were managed" since at least November 21, 2005, going back seven years before the December 5, 2012 start of the elimination period. AR 460–61.

Additionally, Dr. McPhee noted the medical records showed no change in pain management after the March 8, 2010 vehicle accident or after she took leave from work on December 5, 2012. AR 467. Accordingly, he concluded plaintiff could still perform work with the following functional limitations: "sitting frequently with the allowance to shift positions briefly for comfort, standing occasionally, walking occasionally, overhead activities occasionally, lifting no more than 20 pounds occasionally and 10 pounds frequently, bending occasionally, and crawling occasionally." AR 467. Finally, Dr. McPhee noted the medical records did not support a "limitation to upper extremity activities at desk level." *Id.*

In late May 2014, MetLife sent the reports of Dr. Goldman and Dr. McPhee to plaintiff's attorney, specifically requesting that a copy be sent to plaintiff's treating physicians, and asking for a response by June 10, 2014. AR 355. When MetLife made its final decision on June 16, 2014, neither counsel nor any of plaintiff's treatment providers had responded. AR 1328–29.

H.     MetLife Upholds LTD Denial on Appeal

After considering the additional information plaintiff submitted, and having referred plaintiff's case to two independent physician consultants, MetLife upheld its denial of benefits. AR 1328. MetLife sent a letter to plaintiff's counsel on June 16, 2014, noting although plaintiff's medical records showed she had some restrictions or limitations, she did not demonstrate during the elimination period and after that she could not perform her job "with

reasonable continuity." AR 1330. MetLife noted that because plaintiff had exhausted her administrative remedies under the Plan, "no further appeals will be considered." AR 351.

I.    MetLife Reopens Record to Consider Additional Evidence

On June 18, 2014, plaintiff's counsel sent MetLife a letter expressing "surprise[]" at the decision. AR 338. Counsel noted he requested an extension for plaintiff's medical providers to respond to the reports, and the first set of responses was sent on June 17, 2014, a day after MetLife's initial appeal denial, with a second set sent a week later. AR 338. MetLife then considered the additional evidence. AR 32.

One of the additional pieces of evidence was a one-page letter, dated June 16, 2014, from plaintiff's psychiatrist Dr. Ni Hla. AR 171. In the letter, Dr. Hla noted plaintiff was emotionally and psychiatrically stable until June 2013, when her back pain worsened. *Id.* Dr. Hla stated since June 2013, plaintiff has presented "impaired memory and concentration, lack of motivation and interest," and frequent "suicidal ideation." AR 342. There were no psychotherapy notes appended to the letter. *See id.*

Dr. Goldman reviewed the new information upon reopening. AR 119–20. He noted plaintiff did not submit any "documented evidence of measured cognitive dysfunction, active suicidal thinking with plan or intent, emergent transition to a more intense level of care, or other sustained psychiatric signs that would support the need for limitations." AR 120. Further, there were no psychotherapy notes for review. *Id.* Dr. Goldman noted his opinion was unchanged. *Id.*

A copy of Dr. Goldman's amended report was sent to plaintiff's counsel on July 25, 2014. AR 37. Appeals Specialist Evelyn Murphy requested counsel submit Dr. Goldman's amended report to plaintiff's treating physicians for review and response by August 8, 2014, with an additional fourteen days up until August 22, 2014 if requested. AR 37–38.

In response, on August 20, 2014, counsel submitted a two-page letter from Dr. Hla, dated August 18, 2014. AR 20–28. In this letter, Dr. Hla noted since plaintiff has been under her care, plaintiff has "frequently presented with evidence of depression, lack of interest, and motivation, poor sleep, difficulty with her memory and concentration, social withdrawal and

isolation, having thoughts of wanting to give up or die with no intent or plan, and having frequent anxiety attacks with intense worries, and having frequent emotional breakdowns from mood swings." AR 21. Dr. Hla noted the symptoms intensified after August 2013, two months after the end of the elimination period. *Id.* Appended to this letter was a complete medical report, completed by Dr. Hla, discussing plaintiff's restrictions and limitations after the elimination period. AR 23–28.

Evelyn Murphy reopened the case to allow for additional information, including Dr. Hla's letters and medical report. AR 18. After this review, she determined Dr. Hla's additional information did not show plaintiff's impairment during the Plan's elimination period, which ended June 3, 2013. *Id.* She then sent plaintiff's attorney a denial letter on September 4, 2014. *Id.* In the letter, Murphy stated in part, "[a]lthough therapy notes from July 2014 and August 2014 were provided, they would not provide clinical evidence of an impairing psychiatric condition back to the time period in review of December 5, 2012 forward." AR 19.

J.      Plaintiff's Approval for Social Security Benefits after MetLife's Denial

In support of her motion for summary judgment, plaintiff also has submitted a copy of her Social Security Award letter, which is not in the administrative record before the court. Allen Decl. Ex. 1, ECF No. 18-6. According to the letter, the Social Security Administration (SSA) concluded plaintiff was disabled, beginning on December 5, 2012, the same date as the start of plaintiff's LTD elimination period, with her eligibility for benefits starting in June 2013. *Id.* at 1. Although the SSA letter is dated September 8, 2015, *id.*, plaintiff contends she was approved for SSA benefits on August 13, 2015. Pl.'s Mot. at 14. Plaintiff has not provided documentation showing the SSA's analysis supporting its determination of disability.

III.    DISCUSSION

Plaintiff contends she is disabled under the terms of the Plan due to the following conditions: (1) anxiety and depression; (2) insomnia; (3) migraines, (4) jaw pain; (5) neck pain; (6) mid-back and chest pain; (7) low-back and hip pain; and (8) pain in the butt, side of legs, calf, knees, ankles, and feet. Pl.'s Mot. at 10–11. MetLife contends plaintiff has not provided

adequate evidence showing she was precluded from performing her job, even after MetLife

offered modifications to accommodate her limitations.  Def.'s Opp'n at 19.

As explained in more detail below, the court reviews the cross-claims under a

*de novo* standard, does not consider documents submitted after MetLife's appeal denial on

September 4, 2014, and concludes Ms. Dorsey has not established disability under the terms of

the Plan.

### A.    Legal Standards

#### 1.    ERISA Generally

ERISA provides claimants with a federal cause of action to recover ERISA plan

benefits. 29 U.S.C. § 1132(a)(1)(B).  Under Rule 52(a) of the Federal Rules of Civil Procedure,

each party here moves for judgment and the court, through a bench trial based on the

administrative record, evaluates the conflicting evidence.  *Kearney v. Standard Ins. Co.*, 175 F.3d

1084, 1094–95 (9th Cir. 1999).  At hearing, the parties agreed the cross-motions could be

resolved on the administrative record and no evidentiary hearing or credibility finding by the

court was required.

ERISA specifically provides for judicial review of a decision to deny benefits to a

plan beneficiary.  *See* 29 U.S.C. § 1132(a)(1)(B).  It also establishes federal court jurisdiction to

hear such a claim.  *See* 29 U.S.C. § 1132(e).  A denial of ERISA benefits "is to be reviewed under

a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Abatie*, 458 F.3d at 963 ("*De novo* is

the default standard of review.").  If the plan grants discretionary authority, a less stringent "abuse

of discretion" standard is applied.  *Abatie*, 458 F.3d at 967.  "To assess the applicable standard of

review, the starting point is the wording of the plan."  *Id.* at 962–63.

Here, plaintiff contends after California adopted California Insurance Code section

10110.6 in 2012, any discretionary review was nullified, which, in effect, mandated courts to

apply the *de novo* standard of review to ERISA claims.  Pl.'s Mot. at 16.  Defendant also agrees

*de novo* review is the proper standard here. Def.'s Mot. at 20. The court finds *de novo* review is the correct standard, as explained below.

### 2. California's Ban on Discretionary Clauses

On January 1, 2012, California barred application of language in an employment insurance plan granting discretionary authority to the plan administrator. Cal. Ins. Code § 10110.6; *Jahn-Derian v. Metro. Life Ins. Co.*, No. 13–7221, 2016 WL 1355625, at *5 (C.D. Cal. Mar. 31, 2016). The law now provides, in relevant part,

> If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

Cal. Ins. Code § 10110.6. The statute defines "renewed" as "continued in force on or after the policy's anniversary date." *Id.* A renewal of an insurance policy is significant because "[t]he law in effect at the time of renewal of a policy governs the policy . . . ." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 927 (9th Cir. 2012). "Each renewal incorporates any changes in the law that occurred prior to the renewal." *Id.* Thus, any relevant changes in the statutory or decisional law in force at the time the insurance policy is renewed "are read into each policy thereunder, and become a part of the contract with full binding effect upon each party." *Id.*

The Ninth Circuit recently addressed section 10110.6's application to ERISA plans and concluded *de novo* review is appropriate where section 10110.6 voids plan discretionary clauses, affirming a majority of district court cases finding *de novo* review applies. *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, __ F.3d. __, No. 14–55919, 2017 WL 1947883, at *4 (9th Cir. May 11, 2017)[11]; *see also Fowkes v. Metro. Life Ins. Co.*, No. 15–00546,

---

[11] The court notes the Ninth Circuit has most recently decided *Williby v. Aetna Life Ins. Co.*, No. 15–56394, 2017 WL 3482390, at *3 (9th Cir. Aug. 15, 2017), in which it held ERISA preempted California Insurance Code section 10110.6(a) to the extent it would otherwise be applicable to a "self-funded" ERISA plan, *id.*, at *5. *Williby* is distinguishable from the instant case, because the Plan at issue here is not self-funded, but is an insurance policy. *See* AR 1358–1418; *Williby*, 2017 WL 3482390, at *3 (Cal. Ins. Code § 10110.6 applied to insurance policy

15

2017 WL 363155, at *10 (E.D. Cal. Jan. 25, 2017); *Hirschkron v. Principal Life Ins. Co.*, 141 F. Supp. 3d 1028, 1032 (N.D. Cal. 2015); *but see Constantino v. Aetna Life Ins. Co.*, No. 12–0921, 2014 WL 5023222, at *3 (C.D. Cal. Oct. 8, 2014) (abuse of discretion standard applied where the benefit plan gives administrator "fiduciary discretionary authority to determine eligibility for benefits.").

Here, MetLife's insurance Plan went into effect on January 1, 2011. AR 1357. This same Plan was in effect on September 4, 2014, when MetLife denied plaintiff's LTD benefits on appeal. AR 18, 823. The policy "thus continued in force on or after the policy's anniversary date." *See id.*; Cal. Ins. Code § 10110.6. Section 10110.6 applies here and voids any grant of discretion to the Plan administrator. *De novo* review is the proper standard here.

In employing a *de novo* standard of review, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie*, 458 F.3d at 963. "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010). Before applying this standard, however, the court must first decide whether it may consider plaintiff's post-appeal evidence, specifically, the September 8, 2015 SSA letter approving plaintiff's request for social security benefits.

B.    Extra-Record Evidence

Plaintiff requests the court consider the September 8, 2015 SSA award letter based on its determination that plaintiff is disabled. Pl.'s Mot. at 19; Allen Decl. Ex. 1, 1–9. MetLife requests the court disregard this evidence, contending MetLife did not have the SSA determination before it when it denied plaintiff's claim. Def.'s Opp'n at 20.

---

because "[u]nlike [*Orzechowski v. Boeing*]'s STD plan, the disability plans at issue in *Orzechowski* . . . were not self-funded; rather, they were funded by insurance policies," and "[t]he result is a simple, bright-line rule: "if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it.").

When reviewing an ERISA claim, the court is ordinarily limited to the administrative record the plan administrator had at the time of the benefit denial. *See Abatie*, 458 F.3d at 970. This restriction is based on the principle that federal district courts should not function "as substitute plan administrators," and that expanding the record on appeal "would frustrate the goal of prompt resolution of claims by the fiduciary under the ERISA scheme." *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993) (citation omitted). Where, as here, the court reviews an ERISA claim *de novo*, it can admit outside evidence "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995) (citation omitted). In most cases where review is *de novo*, "additional evidence is not necessary for adequate review of the benefits decision, [and] the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination." *Id.*

In *Mongeluzo*, the Ninth Circuit concluded the district court needed to consider outside evidence because after the benefits denial, the plaintiff's doctor diagnosed plaintiff with a disorder falling within the Plan's definition of disability, the diagnosis was not available at the time of disability review, and the evidence was necessary to the factual determination of disability. *Id.* at 941–43.

Here in contrast, the SSA award letter is not necessary or relevant to the court's *de novo* review. The letter does not clarify the basis on which plaintiff is considered disabled. *See* Allen Decl. Ex. 1, 1–9. There is no discussion of which disabling conditions support the SSA award or why, such that the court could fairly and adequately determine if the SSA determination supports finding plaintiff is disabled under the Plan's terms. *Id.* Accordingly, the SSA letter is unhelpful to "enable [the court's] full exercise of informed and independent judgment." *Id.* at 943; *cf. Nagy v. Grp. Long Term Disability Plan for Emps. of Oracle Am., Inc.*, 183 F. Supp. 3d 1015, 1025 (N.D. Cal. 2016) (admitting SSA decision where SSA judge "made a well-reasoned disability determination" and Plan's medical expert's credibility in dispute); *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, No. 08–05278, 2013 WL 6000587, at *3 (N.D. Cal.

Nov. 12, 2013) (same). In light of the sparse record, the court need not consider whether the standards applicable to the determination of Social Security benefits in plaintiff's case are different from those applicable to the decision regarding benefits available to her under the ERISA plan here. *See, e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-34 (2003).

The court will not consider the SSA Notice of Award in reviewing the merits of plaintiff's LTD claim.

C.    Establishing Disability on *De Novo* Review

As noted above, plaintiff contends she is disabled under the Plan due to multiple physical ailments as well as anxiety and depression. Pl.'s Mot. at 10–11.

ERISA rules of construction govern the interpretation of the term "total disability." *Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program*, 222 F.3d 643, 646 (9th Cir. 2000) (adhering to Plan's definition of "total disability" in assessing ERISA claim); *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1099 (C.D. Cal. 2009); *Heighley v. J.C. Penney Life Ins.*, 257 F. Supp. 2d 1241 (C.D. Cal. 2003). The burden of proof is on the claimant to show she is totally disabled under the Policy definition. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004).

As recounted above, to qualify for benefits under MetLife's Plan, a claimant's "[s]ickness or injury" must have caused the claimed disability. AR 1382. Under the terms of the Plan, disability means a claimant's inability to perform her job. *Id.* Further, plaintiff must establish her claimed disability persisted throughout the 180-day elimination period, from December 5, 2012 through June 3, 2013. *Id.*

1.    Plaintiff Was Able to Work throughout Elimination Period with Modifications

Throughout the claims process, plaintiff and her treating physicians repeatedly stated plaintiff could engage in several activities of daily living: driving, grocery shopping, washing dishes, doing laundry in small loads, vacuuming, dusting the house, making quick meals, and taking care of two small children ages five and eleven. AR 1136, 1174–76. Her activities

18

also included engaging in fine finger and eye/hand movements. AR 1156–57. Despite these activities, plaintiff and Dr. Armstrong claimed she could not perform her job duties. AR 1156. MetLife offered a modified position or a work hardening program to slowly acclimate plaintiff back into her work. AR 1175. With accommodations in place, plaintiff would lift up to ten pounds, would get two to three minute stretch breaks at least every hour, would get standard morning, afternoon and lunch breaks, and would receive twenty minute standing and walking breaks. AR 1220, 1228–1229. These accommodations, MetLife concluded, would allow plaintiff to work a full eight hour work day. AR 1235, 1246.

Dr. Armstrong was "very agreeable" to the work hardening program offered plaintiff with the goal of returning plaintiff to work with MetLife's proposed accommodations, AR 1175, which suggests plaintiff could perform her job, impairments aside. *Cf. Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of disability. A claimant bears the burden of proving that an impairment is disabling.").

Plaintiff contends despite her activities of daily living, she frequently complained of pain due to her physical and mental ailments, as documented in her doctors' office notes. Pl.'s Opp'n at 8–9. But the court need not give special weight to a claimant's physician's notes, *Muniz*, 623 F.3d at 1297, or take at face value subjective pain complaints that are inconsistent with the claimant's daily activity. *Seleine*, 598 F. Supp. 2d at 1102. Plaintiff's physical capabilities and her treating physician's amenability to her return to work undermine her disability claim. The court nonetheless reviews the conditions plaintiff contends support disability.

### 2. Mental Conditions do not Support Disability Claim

Plaintiff also has not established disability due to her mental conditions. During the elimination period, plaintiff specifically limited her disability claim to physical ailments, disclaiming any mental disability. AR 1168. It was not until plaintiff appealed MetLife's LTD denial that she claimed disability due to mental ailments. AR 478. At that point, plaintiff relied on two letters from Dr. Hla. AR 20–28, 171. But neither letter supports a disability finding. The first letter states plaintiff was "emotionally and psychiatrically stable till June, 2013 when her

19

back pain got worse[]." AR 171. Given that the elimination period ended in early June 2013, the court cannot infer plaintiff was disabled throughout the period. The second letter fares no better. While it states plaintiff frequently presented evidence of "depression, lack of interest, and motivation, poor sleep, difficulty with her memory and concentration, social withdrawal and isolation, and having thoughts of wanting to give up or die," it says nothing of when these symptoms precluded plaintiff from working. *See* AR 21. To the extent the letter discusses any dates, Dr. Hla states the symptoms intensified after August 2013, which is after the close of the elimination period on June 3, 2013.

Plaintiff has not shown her mental impairments establish disability under the Plan.

3.    Plaintiff has not Established Her Insomnia is Disabling

Plaintiff has not shown insomnia precluded her from performing her job. Any mention of insomnia in the record characterizes it as intermittent, which is not "disabling" under the Plan. AR 429–430, 1382.

4.    Plaintiff has not Established her Migraines were Disabling

Plaintiff complained of migraines while she worked at Sutter. AR 172 (office visit notes from March 5, 2012). Specifically, she described her condition as "dull, sharp, aching, stabbing, and deep," and occurring three times a week on average. *Id.* Despite this impairment, plaintiff was able to exercise three to four days a week and worked nine hours a day from Monday to Friday. *Id.* She received trigger point injections as treatment. AR 438.

After she stopped working, plaintiff's migraines and the trigger point injections continued. AR 454, 1149, 1151–1152. At one office visit during the elimination period, plaintiff told Dr. Jaojoco at the Spine and Nerve Diagnostic Center the trigger point injections worked. AR 454. Plaintiff has not shown her treatment changed or her migraines intensified to preclude her from engaging in the functions of her job. Plaintiff also continued her active daily physical routine that, again, undermines a disability finding. *See Seleine*, 598 F. Supp. 2d at 1093 (sedentary occupation disability claim denied where claimant was able to drive and grocery shop); AR 1134–1135, 1175 (listing plaintiff's daily activities, including driving, grocery

shopping, using the microwave, brushing teeth, doing one small load of laundry per week, and washing dishes).

Plaintiff has not established disability due to migraines.

### 5. Plaintiff has not Established Disability Due to Jaw Pain

Medical records show plaintiff's jaw pain came from clenching her teeth in response to the other unspecified pain she experienced. AR 467. However, nothing in the records shows this intermittent pain precluded plaintiff's daily activities; she has not shown it precluded her from performing her sedentary position at work. Plaintiff has not established disability due to jaw pain.

### 6. Plaintiff has not Established Disability Due to the Balance of Her Other Physical Conditions

The balance of plaintiff's physical conditions include pain in her neck, mid-back, chest, low-back, hip, butt, side of legs, calf, knees, ankles, and feet. While working at Sutter, plaintiff made complaints of frequent neck pain. AR 172 (March 2012 office notes).

These impairments did not preclude plaintiff from working out three to four days a week and working at her job nine hours a day. *Id.* Now, after submitting her disability claim, plaintiff continues to complain of these impairments, but points to no evidence that such impairments preclude her from working. Rather, the evidence tends to undermine such a finding. For example, by April 2013, plaintiff notes her chiropractic appointments had been helping her pain. AR 64. As with her other ailments, plaintiff's subjective complaints were inconsistent with her activities of daily living and the reasonable inferences of her ability to function well enough to work. Plaintiff's ability to drive, wash dishes, go grocery shopping, and pick up her children from school leads the court to conclude she could have engaged in the activities of her sedentary position, especially after MetLife offered her modifications. Plaintiff has not established disability. Met Life's denial of LTD benefits is fully supported by the record.

## IV. CONCLUSION

The court DENIES plaintiff's motion for summary judgment and GRANTS MetLife's motion.

This Order resolves ECF Nos. 18 and 20.

IT IS SO ORDERED.

DATED: August 28, 2017.

_____
UNITED STATES DISTRICT JUDGE